**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 25-cr-206** |
| **v.** | : | |
| | : | |
| **TEVON STEPHENS,** | : | |
| | : | |
| ***Defendant.*** | : | |

# DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Tevon Stephens, through undersigned counsel, respectfully submits this memorandum in aid of sentencing.

## Introduction

Mr. Stephens comes before the Court for sentencing after pleading guilty to one count of Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1) and one count of First-Degree Child Sexual Abuse in violation of 22 D.C. Code § 3008. He accepts full responsibility for his conduct. This memorandum is not offered to excuse or minimize the conduct that brings him before the Court for sentencing. His conduct was wrong and it caused significant harm to many. He apologizes to everyone that was harmed. He pleaded guilty without requiring the government to seek an Indictment. This memorandum is intended to give the Court a full picture of the person who stands before it for sentencing. He is not defined by his unlawful actions, and the Court must understand him as a person in determining the appropriate sentence.

The full picture of Mr. Stephens includes a childhood reshaped by his parents' divorce and years of estrangement from his father. His tale also includes abuse he suffered as a young child

and significant cognitive and learning limitations. His incarceration and recent evaluations have uncovered an untreated history of depression, suicide attempts, and possible psychotic symptoms. Mr. Stephens suffered most of his life with these issues and turned to substances to self-medicate. These issues were present for most of his life, but what broke Mr. Stephens completely was the loss of his older brother, Anthony Jr., to leukemia in 2018. By the account of everyone who knows Mr. Stephens, he never recovered. Ex. A, Letter from Lita Rosario-Richardson, Esq. He also never dealt with the grief, trauma, and issues that came from this loss.

Mr. Stephens comes before the Court with no prior juvenile or adult criminal record. Mr. Stephens is not an unredeemable person that must be locked away for decades. He deserves punishment, including at least 60 months of incarceration. The root causes that led to him engaging in unlawful conduct are treatable. Most importantly, Mr. Stephens is amenable to treatment. He also comes before the Court with a family, a mother, a father, a sister, and lifelong family friends, who have committed to stand beside him and to help him rebuild his life and get the help he needs.

Based on the circumstances described herein, we ask the Court to impose a variance and sentence Mr. Stephens to a term of incarceration below the applicable guideline. This sentence would be sufficient, but not greater than necessary, to effectuate the purposes of sentencing prescribed in 18 U.S.C. § 3553(a).

## Argument

***Legal Standard***

The Court is required to consider the Federal Sentencing Guidelines in imposing a sentence, but *United States v. Booker*, 543 U.S. 220 (2005) provides that the Guidelines are "merely one sentencing factor among many, and the calculated guideline range must be considered in conjunction with the other § 3553(a) factors." *United States v. Reinhart*, 442 F.3d 857, 864 (5th Cir. 2006) (citing *Booker*, 543 U.S. at 245–46). The Guidelines are "but one of eight factors the sentencing judge must consider." *United States v. Ovid*, No. 09-CR-216 (JG), 2010 U.S. Dist. LEXIS 105390, at *5 (E.D.N.Y. Oct. 1, 2010). A within-Guidelines sentence is not presumed reasonable at the district-court level; the Guidelines do not enjoy a legal presumption of correctness. *See Nelson v. United States*, 555 U.S. 350, 352 (2009).

The factors enumerated in 18 U.S.C. § 3553(a) direct the Court to consider the full history and character of the defendant. Focus on the § 3553 factors "produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range." *Ovid*, 2010 U.S. Dist. LEXIS 105390, at *4–5. 18 U.S.C. § 3553(a) requires a "sentence sufficient, but not greater than necessary" when the following factors are considered:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant . . . (3) the kinds of sentences available; (4) the kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . (5) any pertinent policy statement . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). In considering these factors, 18 U.S.C. § 3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

***History and Characteristics of Mr. Stephens***

Mr. Stephens comes before the Court with no record of juvenile or adult criminal convictions. He was raised primarily by his mother, Raena Swann. She has worked in the financial industry for more than thirty years and currently serves as a Bank Secrecy Act manager. Ex. B, Letter from Raena Swann. Those who know Mr. Stephens describe him as a quiet, family-centered man. His aunt describes him as "always smiling, polite, and respectful." Ex. C, Letter from Roshonna Davis. A lifelong family friend who has known him since birth describes Mr. Stephens as a "quiet, respectful, kind, and gentle young man." Ex. D, Letter from Dalle Best. Within what his family calls a "girl family", Mr. Stephens was often the only man. He took on the role of helping care for his grandmother and other elderly grandparents. Ex. B. His sister writes that he "made me feel safe simply by being there." Ex. E, Letter from Shaena Horner.

Mr. Stephens' childhood was marked by instability and loss. His parents separated and divorced when he was approximately eight years old. He and his older brother were split between households. Mr. Stephens remained with his mother and his brother moved in with their father. As a result, Mr. Stephens grew up, in the words of a family friend, "without the consistent presence of a positive male role model" in his home. Ex. D. He became estranged from his father for long stretches, and his father acknowledges that dynamic. Ex. F, Letter from Anthony Stephens, Sr.

Mr. Stephens was himself a victim of abuse as a young child. As documented in the psychosexual evaluation prepared by Lisa Hunt, LPC, LMFT, CSOTP, Mr. Stephens reported that

he was abused beginning at approximately five or six years of age. Ex. G, Psychosexual Evaluation at 4. This history is not offered to excuse his conduct. It is offered as context for his appearance before the Court and the clinical picture that Ms. Hunt describes.

Mr. Stephens has significant cognitive and learning limitations. He received special-education support for reading and spelling in elementary school, was placed in an alternative school, and later earned a high-school equivalency diploma through the Job Corps. *See* Ex. G at 3. Testing conducted for the court-ordered psychosexual evaluation placed him in the "very low" and "extremely low" ranges on the word-reading and sentence-comprehension subtests of the WRAT-5, and the evaluator concluded he "likely has some cognitive limitations" that must be accounted for in any treatment setting. *Id.* These limitations bear directly on how the Court should understand both his conduct and his capacity to benefit from structured, skill-based treatment rather than incarceration alone.

The defining loss of Mr. Stephens' adult life was the death of his older brother, Anthony "Tony" Stephens, Jr., who died of leukemia on April 13, 2018, at the age of twenty-five. The letters submitted to the Court describe the change in Mr. Stephens after that loss. Mr. Stephens became withdrawn and isolated, his routines and appetite changed, and he spent long stretches alone. *See* e.g., Exs. A, B, C, D, E. His sister writes that he "carried a great deal of pain from that loss, even though he did not always know how to express it." Ex. E. Ms. Hunt's evaluation ties the same event to the onset of his depression. *See* Ex. G at 4. Even so, Mr. Stephens honors his brother each year by participating in an event for those affected by leukemia. Ex. B.

Mr. Stephens has a serious mental-health history that went undiagnosed and untreated until these proceedings. He reported depressive symptoms beginning after his brother's death that persisted until his arrest. Ex. G at 4. He has a documented history of suicide attempts, including

an attempt to hang himself while in custody at the outset of this case. This was not the first time he tried to take his life. *Id.* He also disclosed possible auditory and visual hallucinations. *Id.* at 2**.** Ms. Hunt recommends that Mr. Stephens have access to psychiatric care to ensure appropriate diagnosis, medication management, and monitoring of his mental-health status, including suicidality and any psychotic symptoms. *Id.* at 7. Now that these issues are identified and at least partially diagnosed, they must be addressed. Mr. Stephens looks forward to getting the help he needs.

Consistent with his untreated mental illness, Mr. Stephens has a long history of substance abuse. This was likely a coping mechanism to deal with his early trauma and escalated until his arrest. He began drinking alcohol at approximately twelve or thirteen, was a frequent marijuana user, which he said helped him "chill, relax" and reported irregular use of other substances. Ex. G at 3–4. Ms. Hunt frames this substance use, like his offense conduct, as bound up with his depression and his difficulty tolerating and communicating emotion.

Despite these obstacles, Mr. Stephens has a consistent work history in the janitorial field, including roughly two years cleaning aircraft and collecting trash at Dulles Airport. Ex. G at 4. His father writes that Mr. Stephens "has always been a pretty hard worker" who held jobs "for years at a time." Ex. F. Since his incarceration, Mr. Stephens has turned to his faith and, by his mother's account, committed himself to change. Ex. B. Mr. Stephens has not merely resolved to change, but he has already begun. While in custody, he was baptized on July 21, 2025. *See* Ex. H, Certificate of Baptism. He also voluntarily completed the twelve-week "Thinking for a Change" program, an evidence-based, cognitive-behavioral curriculum developed by the National Institute of Corrections that teaches cognitive self-change, social skills, and problem-solving, and was awarded a certificate of achievement on October 23, 2025. Ex. I, Certificate of Achievement. The

program's facilitator describes him as "engaged, thoughtful, and open to learning," and reports that his organization is prepared to continue working with Mr. Stephens after his release. *See* Ex. J, Letter from Kornah Flowers. This is the same kind of structured, skill-based programming Ms. Hunt identified as the most effective path for Mr. Stephens. Ex. G at 6-7. Importantly, he sought this out on his own initiative, before sentencing.

Mr. Stephens' family uniformly describes him as genuinely remorseful. Exs. A, B, C, E. Critically, his family has offered not mere words, but a concrete plan. His father has offered to house him in Suitland, Maryland, and to help him obtain his driver's license and a commercial driver's license so he can work steadily. His father, who was absent for most of Mr. Stephens' life, is stepping up now. He writes that if released to him, Mr. Stephens "wouldn't even get as much as a parking ticket." Ex. F. His sister, a Program Coordinator who works with the D.C. Department on Disability Services supporting individuals with intellectual and developmental disabilities, has committed to helping him access structured programming and mental-health services and to holding him accountable. Ex. E. His mother has committed to helping him engage in therapy, support groups, and any other appropriate services. Ex. B. This concrete and comprehensive reentry support network will allow Mr. Stephens the ability to succeed. When combined with the treatment regimen detailed by Ms. Hunt, he will have access to the tools to succeed. He will show through his actions that the conduct that brings him before the Court will not be repeated.

***The Psychosexual Evaluation Establishes That Mr. Stephens' Risk Is Manageable and His Needs Are Treatable***

At counsel's request, Lisa Hunt, LPC, LMFT, CSOTP, Executive Director of the Center for Clinical and Forensic Services, conducted a psychosexual evaluation of treatment needs and risk assessment. Her evaluation included a Static-99R evaluation, which complemented the

psychosexual evaluation completed for the United States Probation Office by Tara Mazzotta. Ex. G at 1. Ms. Hunt leads a practice that evaluates and treats individuals charged with sexual offenses. Her resume is attached as Exhibit K. She has extensive experience working with individuals that have committed sex offenses. At any given time, her practice has more than 300 individuals in treatment. She routinely works with the federal court in the United States District Court for the Eastern District of Virginia and courts in the Commonwealth of Virginia. Ms. Hunt interviewed Mr. Stephens on four occasions and reviewed the Statement of Offense, the Presentence Report, Dr. Mazzotta's evaluation, and the Static-99R. *Id.* She was able to build a rapport with Mr. Stephens and create a comprehensive treatment plan.

On the Static-99R, a widely used actuarial instrument, Mr. Stephens' risk category largely turns on his age at release. This is because age is the only dynamic item on the scale. If he is released before age thirty-five, his score is a 4 ("Above Average"). However, a difference of one year matters. Release between the ages of thirty-five and forty reduces his score to 3. Release between the ages of forty and sixty reduces the score to 2. Release after the age of thirty five results in the risk falling to the average range. Ex. G at 5–6. For a score of 2, the evaluator reports an estimated five-year sexual-recidivism rate of 4.6% and a ten-year rate of 7.2%; for a score of 3, the corresponding rates are 6.5% and 10.1%. *Id.* at 6. Ms. Hunt notes that actuarial scores describe a group of similarly scored offenders, not a prediction about any single individual. *Id.*

After spending time with Mr. Stephens, Ms. Hunt identified his dynamic risk factors. They include: intimacy deficits, cognitive distortions, communication skills, education regarding consent, prosocial decision-making and supports, sexual preoccupation and sex as a coping mechanism, arousal management, and substance-use monitoring. Ex. G at 6. Ms. Hunt explains Mr. Stephens' conduct as rooted in a lifelong difficulty feeling emotionally connected to others,

which made the anonymity of online spaces feel less threatening and easier to retreat into, and in his use of sex to cope with depression, which over time desensitized him to the material he was viewing. *Id.* at 5. To address this, Ms. Hunt recommends treatment that emphasizes skill-building over insight. *Id.* at 6-7.

Ms. Hunt's recommendations are detailed and concrete. They include sex-offender treatment following the Risk-Needs-Responsivity model, ideally beginning before release and continuing in the community. She also recommends psychiatric care and medication management, substance-use monitoring through urine screening, and other restrictions and conditions. Ex. G at 6-7. Ms. Hunt notes the research consensus that individuals who complete sex-offender treatment reoffend at lower rates, an effect enhanced when programming follows the Risk-Needs-Responsivity principles. *Id.* at 6–7. This treatment will also be well received because Mr. Stephens wants it. In short, Ms. Hunt, an eminently qualified clinician that is a certified sex offender treatment provider, has determined that Mr. Stephens' risk is manageable and his needs are treatable. She has also provided a detailed plan that would maximize success. This includes services that are tailored to Mr. Stephens' needs.

***The Need to Avoid Unwarranted Sentencing Disparities***

18 U.S.C. § 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). When compared with cases involving similar conduct and charges, the sentence requested is sufficient to achieve the goals of 18 U.S.C. § 3553(a).

Defendants who distributed and possessed child pornography in this District have consistently received terms between roughly six and twelve years, even where the surrounding conduct was serious. See *United States v. Giraldo*, No. 1:08-cr-00014-RWR (D.D.C.) (74 months);

*United States v. Accardi*, No. 1:09-cr-00009-CKK (D.D.C.) (100 months); *United States v. Monzel*, No. 1:09-cr-00243-TJK (D.D.C.) (120 months). Two additional cases demonstrate this point. They are defendants who had prior convictions and engaged in similar or more serious conduct than Mr. Stephens.

The first is *United States v. Loreng*, No. 1:12-cr-00132-JDB (D.D.C.). The defendant in *Loreng* was convicted only of possession of child pornography, but the conduct surrounding that conviction was far graver than the conviction alone suggests. He distributed child pornography directly to an undercover officer. The material he possessed and distributed included sadistic content. During the course of his communications with the undercover officer, he described committing hands-on sexual abuse. He did all of this after a prior conviction that "arose out of a 21-Count Indictment against the defendant for sexually abusing his sister over a 6-year period." His plea agreement permitted the Government to argue for a sentence up to 168 months. Mr. Loreng was sentenced to 96 months.

The second is *United States v. King*, No. 1:22-cr-00137-RC (D.D.C.). Mr. King possessed more than 10,000 images and videos of child sexual abuse spread across several devices. He used a messaging application to trade that material with other users. He committed these offenses after a 2015 conviction for possession of child pornography in Fairfax County, Virginia. That prior conviction triggered an enhancement under 18 U.S.C. § 2252(b)(2) and raised his mandatory minimum to ten years. Mr. King was sentenced to 120 months.

Mr. Stephens, by contrast, comes before the Court with no prior record of any kind. In considering 18 U.S.C. § 3553(a)(6), a defendant like Mr. Stephens with a clean record, sentenced for the first time, should not be treated more harshly than the repeat offenders whose conduct in this District has drawn sentences of 96 and 120 months.

Here, the Court is sentencing Mr. Stephens for a violation of federal law and a violation of the D.C. Code. This is significant as it provides the Court with an additional tool. Specifically, the guidelines that apply to Count 2 call for a sentence of 90-180 months. Based on available data, for offenders under the age of 30, there have been 23 convictions for First Degree Child Sex Abuse. In 61% of cases, the Court has imposed a sentence that includes 120 months or less of active incarceration. In 35% of cases, the Court has imposed a sentence of less than 120 months. The Court has imposed a sentence of 90 months in 22% of cases. In one case, the Court imposed a sentence of 100 months, with 70 months suspended and 30 months of active incarceration.

The Court can impose a sentence at the high end of the guidelines, 180 months, but can suspend a portion of that sentence. For example, the Court can sentence Mr. Stephens to 180 months and suspend 90 months. Mr. Stephens would serve seven and a half years of incarceration. After he was released, he would have another seven and a half years of suspended time. This would serve as a deterrent to any future violations of law. While we are confident that Mr. Stephens will not reoffend, it would give the Court a tool to immediately hold him accountable. This would be in addition to supervised release and sex offender registration requirements. Given his complete lack of criminal history, cognitive and mental health issues, and concrete and comprehensive treatment plan, we believe a sentence with a substantial suspended sentence is appropriate.

***The Need for the Sentence Imposed***

The Court is required to impose a sentence that is sufficient, but not greater than necessary, to satisfy each purpose of sentencing under 18 U.S.C. § 3553(a)(2). The seriousness of the offense and the need for just punishment are partially accounted for in the 17 months Mr. Stephens has

served. A defendant with no prior record, facing his first period of incarceration, does not require the lengthiest available term to promote respect for the law or to be adequately deterred.

The need to protect the public is addressed less by additional years of incarceration than by the structured treatment and supervision the evaluator recommends. As set out above, Mr. Stephens' risk falls in the average range depending on age at release, his dynamic risk factors are treatable, and a licensed evaluator has concluded he is amenable to treatment. Ex. G at 5–7. The conditions the Court can impose, sex-offender treatment on the Risk-Needs-Responsivity model, psychiatric care, substance monitoring, and collaborative management of his internet and minor access, are calibrated to protect the public over the long term far more effectively than incarceration alone.

Incarceration is also markedly more punishing for Mr. Stephens than for a typical defendant. He suffers from mental health issues, cognitive deficits, and he attempted to take his own life while in custody in this very case. Ex. G at 4. A defendant with his vulnerabilities experiences confinement, particularly at the D.C. Jail and the Correctional Treatment Facility, where he has been held since March 2025, with a severity that the raw length of a sentence does not convey. The conditions at the D.C. Jail are well documented. *See* Liam Bowman, *Three Inmates Injured in D.C. Jail Stabbing, Police Say*, Wash. Post (Sept. 26, 2025); Office of the D.C. Auditor, *Urgent Need for New D.C. Jail* (May 28, 2025) (documenting violence, infestation, flooding, mold, and difficulty accessing outside medical care).

Finally, 18 U.S.C. § 3553(a)(2)(D) directs the Court to consider the need to provide Mr. Stephens with needed treatment "in the most effective manner." The evaluation makes plain that the most effective path runs through treatment, ideally begun before release and continued in the community with the support of his family, not through incarceration prolonged beyond what the

other sentencing purposes require. While the BOP does have facilities with Sex Offender Management Programs (SOMPs), they cannot replicate the care available to those in the community.

***A Fine Is Unnecessary***

We respectfully request that the Court exercise its discretion to decline to impose a fine upon Mr. Stephens. Imposing a monetary fine against Mr. Stephens would not serve the interest of justice or the public interest. His conviction entails a number of consequences, all of which will negatively impact his life. Upon his release from prison, Mr. Stephens will work to reintegrate back into society and obtain stable employment. The imposition of a fine against Mr. Stephens would only serve to hinder this objective.

## Conclusion

Mr. Stephens does not ask the Court to overlook the seriousness of his conduct. He has accepted responsibility for it. He asks only that the Court weigh the whole of his life, his own early trauma, his cognitive limitations, his serious and untreated mental illness, the profound loss of his brother, his complete absence of any prior record, his treatable and manageable risk, and the concrete family support waiting for him, in fashioning a sentence that is sufficient, but not greater than necessary. For the foregoing reasons, Mr. Stephens respectfully requests that the Court impose a sentence below the guidelines and incorporating the treatment plan created by Ms. Hunt.

Respectfully submitted,

*/s/ Marc Eisenstein*

Marc Eisenstein
Coburn & Eisenstein PLLC
1200 G Street, NW, Suite 800
Washington, DC 20005
Tel: 703-963-7164
marc@coburngreenbaum.com
Counsel for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 1, 2026, a copy of the foregoing was filed with the Clerk of the Court and served on all counsel of record via ECF.

/s/

Marc Eisenstein